All right, Peel v. Beard, please state your appearance. Charles Corey for Regina Peel. May it please the Court. Miranda held that warnings were required when the person being interrogated was either in custody at the station house or otherwise deprived of his, and I'll stick in her, freedom in any significant way. That is what this case is all about. And I would say that to get past the litigation bar, I might as well talk to that first. The litigation bar, how am I going to get past that? 2254 D. We'll start there. I don't think the ‑‑ I mean, very seldom is it so clear that the Court of Appeal violated not just one but all three of those 2254 D and by contrary two, and I'll cite the case. This case is contrary to Orozco v. Texas, 394 U.S. 324, which came down three years after Miranda. And that's a case where agents came into the person's home and they acted like it was their home, interrogated him, and the Supreme Court, three years after Miranda, said this was a custodial situation. It didn't make any difference. So there is the contrary two. Now, the applying this is we have Miranda itself, which talked about a police‑dominated atmosphere. It doesn't make any difference. It doesn't make any difference counting the number of officers that were there. What did they do? The Court of Appeal was unreasonable in saying this was not an overly aggressive interrogation. Anybody being interrogated by these police officers, the way that this minister of this church was interrogated, would say this is overly aggressive. They called her every name in the book. They just about called her a child molester. They did. It's in the record. You're like a Catholic priest who's molesting children. They said that. You're a liar. You're a cheat. And the way they did it was so unfair. They would ask her questions. She would say, I don't remember. Then they would bring out documents and she would say, oh, yes, that's right. And then they said, see, you're a crook. You're a liar. You're trying to fool us. And all she did was have the same kind of memory that I have. I hope I'm never interrogated that way because I can't. I am like a lot of lawyers. When I get ready for an oral argument, I have a bathtub mind. I am filling my bathtub up with facts about this case. I have another oral argument here tomorrow. I better pull the plug or I'll be arguing the wrong case. But the point is I have to have my calendar to find out where I am. Somebody asked me where I was last week. I run for my calendar trying to figure out where I was. Maybe it's because I have my flock. She had her flock. Or maybe it's just I think a lot of lawyers are that way. They have to have their calendar to find out. Counsel? Excuse me. Isn't it the case, though, that she consented to the interview? This happened in her living room. She asked for some water at some point. I think they let her have that water. Aren't there several factors to indicate that this would have been a consensual and not an interrogation in the same sense that you're indicating? She's friendly. And we're not talking about consent. That's not an issue. That is not the issue. And the fact that she said thank you and goodbye, she was gracious. They weren't. This was police dominated. At one point, well, let's face it, the police admitted that she asked for a lawyer. That's clear. And then when they told her, she asked for a lawyer. An hour before it ended, she said, didn't I ask you for a lawyer? And he said, yes. This is in the transcript of the, I asked you an hour ago, could I call my attorney? And Detective Campbell said, and I said no. And it's your position, Mr. Curry, that at that point she was under custody, not just plain detention during the execution of the warrant, and therefore questioning should have ended at that point. Yes, you said it. That's my point. It should have ended. And you know what's sad about this case is that I might not even be here. I might not even be here. if the attorney had made a pretrial motion. But he didn't. The attorney in this case, I know this is uncertified, and I'm using valuable time on an uncertified issue, but I think it's so important that he didn't jump up and object until after the jury had heard the opening statements and actually had heard the tape of this entire interview. And it was about to be introduced into evidence, and then he says, oh, I object. She was in custody, and none of this should have come in. I know, and I'm quoting him, I know it's sort of like the horse is out of the barn. Excuse me. Not only was the horse out of the barn, but the horse was in the jury room munching hay, waiting for the jurors to come in there in the form of that transcript, which they all had. He was derelict. But I asked it to be certified. It wasn't. Randy Coven, who did the appeal in this case, a very good job in the appeal, filed a habeas in the state court on his ineffective assistance of counsel, summarily denied. But my issue is strong. It is strong. And I have Craighead. Now, just because Craighead is a district court case, it doesn't make any difference as far as the law is concerned. The only difference between Craighead, and it's ironic that Craighead was being interrogated at the same time as Regina Peel, exactly the same day, in Arizona, the same time. And I put that in my brief. And I said, that was a bad day for the Constitution. It was. That's really a coincidence. In Craighead, this court said, no, that's a police-dominated atmosphere. Mr. Curry, the problem with your citation of Orozco is the pivotal issue in this case. In Orozco, Justice Black wrote, from the moment he gave his name according to the testimony of one of the officers, petitioner was not free to go where he pleased, but was, quote, under arrest, unquote. Here, the whole question is whether the appellant was under arrest or was free to leave. I'll answer that. She was not free to leave because the officer said she wasn't free to leave. And a detention doesn't apply. But she was not free to leave because they had a warrant and they were doing a search of her house. And if they found evidence that was inculpatory, they could then arrest her. And we have cases that say that a detention during the execution of a valid search warrant is not custody for purposes of Miranda. Correct? Yes, but the search warrant occurred late. And I've only got a minute and 50 seconds left. The light came on. We'll give you two minutes. Will you give me two minutes? Sure. Thank you. Good morning, Your Honors. Deputy Attorney General Blythe Leskay. May it please the Court, the totality of the circumstances here, and that's really what we have to consider, show the petitioner was not in custody when she was questioned, the California Court of Appeals so found, and that decision was eminently reasonable under United States Supreme Court precedent. The facts here, the vast majority of the facts here, show that there was, in fact, no custody. Petitioner was a former police officer of eight years. When the detective showed up at her door, she invited them in. She voluntarily consented to this interview, and although counsel notes that consent is not what's at issue here, that is certainly a factor for the Court to consider under the totality of the circumstances. There are only – What I have a problem is in distinguishing, counsel, help me if you can, between the concept of when a suspect is in custody and when a suspect is – and, therefore, you have to give the Miranda warnings, and if he says he wants to talk to his lawyer, you have to stop questioning, all right? And then a detention while a warrant is being executed. If they tell her, if the police tell her, you can't leave the house until we've finished with you, with the warrant, why isn't that, for all practical purposes, an arrest? Well, a detention is obviously something short of arrest under the law, and detention is usually a temporary situation while the police are either investigating a traffic stop, while they're executing a search warrant, as they did in this case, and even though she was not technically free to leave because she was being detained at that point, she could have stopped the interview. That doesn't mean that she had to continue talking to them, which she, in this case, did. Counsel, but she had two officers sitting across her, questioning her and calling her, as counsel has indicated, a whole host of different things, making a whole host of accusations. How did you think that she felt free to leave? Well, I think she, first of all, as somebody who, again, is a former police officer, she would have understood that she never had to consent, that she had to never sit down with them to begin with. She would have understood the situation. This is a voluntary interview. The bulk of the interview took place over two and a half hours with just those two police officers before the search warrant was even mentioned. So it's that portion of the interview that is really the focus. And both the California Court of Appeal and the District Court found that the questioning of the officers was not particularly aggressive or confrontational. They did suggest that she was not being truthful to them, but that sort of questioning has been upheld by the United States Supreme Court in Yarborough versus Alvarado. There, the court described the questioning by the police officer as appealing to the suspect's honesty, expressing disbelief in his initial story when he denied that he was near the shooting. It's the same kind of questioning that we have here. The court there explicitly found that it was not coercive and found that the suspect there was not in custody. And there we're talking about a 17-year-old who was brought to the police station by his parents. Here we're talking about a former police officer sitting in her own living room voluntarily speaking to the police who show up. Counsel, one question. You mentioned that for two and a half hours she was questioned by the police. How many police were there? Two. Two. Before the search warrant was mentioned. Correct. Were the admissions that were used at the trial and are the subject of this appeal made before the search warrant was mentioned or after the search warrant was mentioned? Her statements both before and after were admitted at trial. The vast majority of the interview took place before the search warrant was executed. What happened after that is really kind of redundant. A lot of the questioning at that point was redundant, and there was no discussion in the trial court of separating those two. Remind me, please, what were the admissions that were so damaging to the defendant? Actually, she didn't make any admissions. So really this was the interview was admitted as consciousness of guilt because she changed her story because she denied facts, that then she was presented with evidence of the facts, and she would then change her story. So it was really there were no admissions that she made. There was no confession here. There was nothing like that. It was really just a consciousness of guilt. So that's what the interview was admitted for. And going back to Your Honor's earlier question about the difference between detention and arrest in terms of custody, the first question when we're looking at custody is, would the person reasonably feel free to stop the questioning and leave? That's just the first part of it. So even in a detention where maybe that's not true, the Supreme Court has held that we then need to move to a second step and look at the overall environment that the questioning is occurring. Is this environment, does it present the same kind of inherently coercive atmosphere that Miranda was concerned with where you have a station house, somebody being arrested, taken to the station, questioned there, handcuffed, and here the totality of the circumstances were nothing like that. We have a conversation in her room, in her living room, where she invited detectives in. It's a familiar surrounding. She was not restrained in any way. Well, she was restrained from talking to her lawyer by a policeman who said, no, you can't talk to your lawyer. And that's actually an interesting point because the redacted portion of the interview is where she first requests a lawyer. And it's very clear the context in which she's requesting a lawyer is actually not for the interview itself, but when the detective asks her if she's willing to take a polygraph. And at first she says she's willing to take a polygraph, and then she immediately says, can I call my lawyer? And he says, no, you're not under arrest. You're just being detained at this point. And he again asks, will you come down and take a polygraph? And she demands, she stands firm and says, I will not take a polygraph without my attorney. There's no problem with letting her talk to her lawyer and being in the house for the period of the search, right? The cops could have said, sure, as long as we can see where you are and that you stay in the house while we execute this search warrant, you can talk to whoever you want to. But they told her, no, you can't talk to your lawyer. Now, isn't that coercive? Not when you look at the specific context, because she wasn't asking for a lawyer to talk about the search warrant that's being executed. She wasn't asking to talk to her lawyer about the questioning that was happening at that point. She was asking for a lawyer if she was taken to take a polygraph. That's what she wanted a lawyer for. And she and the police kind of went round and round about this, and they ultimately were trying to dissuade her from having an attorney present for the polygraph. They weren't trying to dissuade her. They were prohibiting her. They told her that she couldn't call her attorney at that point. Yes. That's not dissuasion. Well, I'm saying as far as the later polygraph, because it's clear that the reason she wanted an attorney was to accompany her to take a polygraph. She did not say, well, and I want to call my attorney right now, and I want to talk to my attorney about the questioning, or I don't want to talk to you anymore, or she never even suggested that she did not want to continue talking to the officers. Quite the contrary, right straight through to the very end of this encounter, she wanted to talk to them. She continued talking to them. She did so voluntarily. And it was right at the end when they were about to leave, she finally says, you know what, I don't want to talk to you anymore. And they're getting their things ready to leave at that point. So she clearly knew how to tell them that she didn't want to talk anymore. She clearly knew that that's something that she could do. And she, in fact, did that. And even after that happened, she says, you know, thank you very much for talking to me, and I'll call you later. She was not, in fact, coerced. This was not a coercive environment from beginning to the very end. One question. Do you agree with Learned Counsel that Craighead should be followed here? Well, Craighead, first of all, is a direct appeal case. So in the ADEPA context, the application is not as applicable as certainly the Supreme Court cases that we've discussed. And Craighead is also clearly distinguishable on its facts. There you have eight to ten law enforcement personnel from three different agencies coming in, immediately executing the search warrant. The two officers who questioned the defendant took him off into a small room, isolated him. One of them stood by the door, kind of like guarding the door. It's a very different situation that we have here with the three of them sitting in her living room, on the couch, having a conversation. Okay, thank you. I took you over your time. Thank you very much. Rebuttal, please. Thank you. Craighead is the law. The court said in Craighead, if a reasonable person is interrogated inside his own home and he's told he's free to leave, and she was never told she was free to leave. That's important, isn't it, Your Honor? Never told she was free to leave. Where does that person go? The library? The police station? He's already in the most constitutionally protected place on earth. To be free to leave is a hollow right. If the one place the suspect cannot go is his own home. That's a great line from the Ninth Circuit. And it's merely applying Miranda. It's merely applying Miranda. And the only difference in Craighead is that there was no state court decision to have to defer to. So just briefly in my minute and 12 seconds left, what did the state court say to uphold this? They quoted from Beckwith. And I've got to get my glasses to read this. But Beckwith is a case where IRS agents were in someone's home. And that made a lot of difference to the California Court of Appeal. Look, there's a Supreme Court upholding an interrogation in someone's home. But listen to what the IRS agent said. This is in the record of Beckwith. The IRS agent said, I cannot compel you to answer any questions or to submit any information if it might incriminate you. Anything you say can be used against you. And if you wish, you may seek the assistance of counsel. That's what they said before they talked to the person. That's in Beckwith. That was never said here. That was never said here. And I've got 10 seconds. So I once again say the AEDPA doesn't apply. There isn't a bar to you. Because they left out the facts. They really did leave out the terrible, I think terrible, or really aggressive interrogation. They left that out in their discussion. And they didn't apply the law properly. And they used a Supreme Court case, which is Beckwith, as their main support, which doesn't apply. Because that person was given a Miranda warning. Not exactly technically Miranda, but it was good enough. Thank you. Thank you very much, Mr. Currie. Thank you. The Court thanks counsel for a very good presentation. And the case of Peel v. Beard is submitted. And we'll go to the next on the calendar, which is
judges: Fernandez, Bea, Mendoza